FILED
CLERK, U.S. DISTRICT COURT
06/12/2026
CENTRAL DISTRICT OF CALIFORNIA
BY mba DEPUTY
DOCUMENT SUBMITTED THROUGH THE ELECTRONIC DOCUMENT SUBMISSION SYSTEM

ALEX MOSTOVOI, PRO SE,

*Plaintiff*

vs.

NEIL DAVID BIAFORE AND ROBERT H. WILSON, JR.,

*Defendant(s).*

**UNITED STATES DISTRICT COURT CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL ACTION 5:25-cv-03157-SVW-AYP**

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Alex Mostovoi ("Plaintiff"), by way of an amended Complaint against Neil David Biafore ("Biafore" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, arising from the Defendant's fraudulent misrepresentations and omissions in connection with the marketing, purchase and sale of securities. In addition, within the Court's supplemental jurisdiction, the Defendant is liable for common fraud upon the Plaintiff in connection with his investment in TQG (defined below). Finally, the Defendant caused TQG (defined below) to violate an employment agreement entered between the Plaintiff and TQG as part of the investment in TQG, which violation resulted in unpaid wages to the Plaintiff.

2. The Plaintiff seeks damages resulting from the Defendant's intentional fraud, material misstatements and omissions that induced the Plaintiff to invest in TQG, causing substantial financial harm in the amount of Plaintiff's investment ($25,0000). The Plaintiff also seeks the payment of unpaid wages in the amount of $29,250 for the time employed by TQG pursuant to the Employment Agreement dated May 24, 2025 (the "Employment Agreement").

## JURISDICTION AND VENUE

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C § 1367(a). With respect to the claim for unpaid wages, this Court has supplemental jurisdiction under 28 U.S.C § 1367 as the Plaintiff's employment with TQG was part and parcel of the investment scheme.

4. Venue is proper in this District under 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because the acts and transactions constituting the violations occurred in this District, the Defendant resides in this District and the Defendant transacts or is deemed to transact business here because of his position as the Chief executive officer and director of TQG.

## PARTIES

1. Defendant Biafore is the founder, Chief Executive Officer and a member of the Board of Directors (the "Board") of TQG, Inc., also known as The Qwik Group, Inc. ("TQG"), and resides at 446 Wandering Way, Palm Springs, CA 92262.

2. TQG is a corporation incorporated in Delaware with a principal place of business at 407 California Avenue # 6, Palo Alto, California. TQG leases a small office at that address and conducts business in California (installation and operation of lockers to hold packages for customers in the "last mile delivery" framework) through that office. TQG also owns property (a single non-operational locker) in Santa Cruz, CA.

## MATERIAL FACTS

3. On or around May 24, 2025, the Plaintiff and TQG executed a Non-Disclosure Agreement, Employment Agreement, Simple Agreement for Future Equity, and Equity Agreement for Services (collectively, the "Agreements").

4. At the same time, the Plaintiff wired to TQG $25,000 in exchange for 250,000 series A common shares of TQG, fully paid and vested (the "Securities"), based on the valuation of TQG of $40,000,000. The completed wire is set forth as Exhibit A. That value came down from the initial valuation of $72,000,000 and was a further "discount" from the valuation of $112,000,000 that Biafore claimed was the "true value" of the company. Upon the purchase of Securities, Plaintiff became an investor in and shareholder of TQG as well as an advisory board member and independent contractor and consultant to TQG. Under the Employment Agreement (set forth as Exhibit B), Plaintiff became an at-will employee of TQG, with duties assigned and work controlled by the Board of Directors of TQG, with an annual salary of not less than $59,000 "payable in accordance with the Company's payroll schedule." Employment Agreement ¶¶ 2 and 4(a).

5. Prior to executing the Agreements, the Plaintiff in April and May 2025 had multiple telephone and zoom discussions with Biafore regarding the proper valuation of TQG and its business prospects in the context of the Plaintiff considering the purchase of the Securities. Biafore made specific, affirmative repeated representations to Plaintiff of present and near-present fact:

(a) Biafore had secured 2 large investors who have committed contractually to invest $100 million and $25 million, respectively, in TQG.

(b) TQG has established a continuing relationship with Circle K (a national operator of gas stations) and unspecified national retailers as well as ongoing negotiations and contacts with Walmart.

(c) Biafore assured the Plaintiff that the first 100 lockers were being installed in Northern California "within days."

(d) Biafore represented that multi-person professional teams that were comprised both of TQG employees and contractors were actually at those times working on specific installations.

(e) Biafore urged the Plaintiff to speak with Robert Wilson, a director of TQG at the time, who Biafore referred to as an accomplished businessman and a partner at Accenture, a global publicly-traded consultancy, for the purpose of validating Biafore's representations of TQG's value and immediate business plans.

(f) Mark Timchula, a consultant hired by Biafore to publicly solicit investors, repeatedly contacted the Plaintiff in April-May 2025 urging the Plaintiff to complete the contemplated investment "immediately" as the opportunity to invest at the proposed valuation was closing.

6. In response to the Plaintiff's repeated requests to provide documentation confirming the above claims of value and disclose basic corporate information (i.e., capital structure of the corporation, governance, business plan, valuation methodology, 2025 budget), Biafore on or around May 9, 2025 forwarded pdf documents styled "marketing," "locker installment guide," "TQG history," and "TQG financials." The "financials" (set forth as Exhibit C) showed purported installation of 1,000 lockers in each of "year 1," "year 2," and "year 3," and could not be called financials in any professional sense of that word but rather represented an aspirational set of assumptions and sketchy future plans. The "Deck" (set forth as Exhibit D) sent to the Plaintiff by Biafore as part of the May 9, 2025 package, states that [TQG] is "the first parcel locker network that works with *all* U.S. mail couriers (FedEx, UPS, DHL, USPS)", and highlights "Lockers Powered By Our Proprietary Software". These statements are not qualified or further explained by any further facts regarding the actual stage of readiness of the lockers or availability of the software therefor.

7. During Plaintiff's telephone and zoom conversations with Biafore, the latter repeatedly urged the Plaintiff to speak with Wilson about the proper valuation of TQG (which Biafore claimed was $112,000,000) and TQG's business plan and business prospects. Biafore described Wilson as a high-profile accomplished partner at Accenture (a global publicly-traded consultancy) who is aligned with the Plaintiff as an investor and should be able to verify Biafore's rationale regarding TQG's valuation. Wilson in fact had not made any investments in TQG.

8. Wilson's LinkedIn profile in May 2025 listed him as a director of TQG and a partner at Accenture. Some time in early August 2025 Wilson revised his LinkedIn profile to remove the reference to his TQG directorship but left his current status as a partner at Accenture. Accenture has confirmed to the Plaintiff that at that time the firm had no association with Wilson.

9. During the conversations leading to the Plaintiff purchasing the Securities and thereafter, the Plaintiff requested multiple times that the Defendant provide corporate information about TQG and arrange for conversations with employees of TQG and other investors. In response, Biafore provided piecemeal written excerpts not showing that they were final, official and legally binding documents. Set forth as Exhibit E is the "Shareholder Rights of Class A and Class B Common Stock," an excerpt of a writing purporting to represent "corporate documents."

10. Biafore has never disclosed that he had not invested any of his own money into TQG. Biafore had repeatedly told the Plaintiff that he (Biafore) had the same interests as the Plaintiff and other investors and purported to represent all investors in TQG.

11. TQG owns the only non-operational locker in Santa Cruz, CA. That locker was installed in June 2025. The locker could not be connected to power supply or the internet because it did not have functioning software. The Plaintiff personally inspected the locker on or around July 26, 2025.

12. The Plaintiff relied on Biafore's descriptions of the business, employees and the larger contractor team, alleged capital commitments of $125 million in the aggregate and contractual relationships with national networks to install TQG's lockers in concluding that TQG was worth at least $40 million and making an investment of $25,000 on that basis. In addition, the Plaintiff regarding his salary under the Employment Agreement as adequate compensation for the many hours the Plaintiff spent on zoom and phone calls with Biafore and other investors regarding TQG.

13. On or around July 24, 2025, the Plaintiff met with Biafore at TQG's office. The office space was a small room, with a desk and desktop, server equipment and a couple of chairs. Biafore admitted that TQG at that time only had 2 employees, one clerical employee in Indiana and another (who just started on an unpaid basis) in Palo Alto. TQG was not conducting operations because it did not have personnel for that. Biafore further admitted during the meeting that the second employee who started several days prior to the meeting had been tasked with developing software for the lockers as the existing software required additional work and was not ready for implementation.

14. On or about August 4, 2025, TQG's advisory board (i.e., investors, of which the Plaintiff was a member) convened in Las Vegas, NV. The purpose of the meeting was to assess the progress of the firm's business operations and specifically roll-out of lockers. At the meeting, several advisory board members/investors repeatedly demanded disclosure of basic corporate information (ownership, bylaws, certificate of formation, shareholder agreements, corporate contracts, financials and a bank statement); none of that information was provided. Biafore alleged that he had received advice from an unspecified source that prevented him from disclosing that information. Biafore admitted at the meeting that only one locker had been installed in Santa Crus CA and that locker was non-operational and not connected to the power or the internet. There were no actual and actionable plans to install any further lockers at that time.

15. At the August 4, 2025 meeting, investors demanded that Biafore disclose TQG's cash position. Biafore admitted that he was the only person in possession of TQG's bank accounts, bank information and statements. Biafore never provided any bank information or financials or in fact any other information about the actual financial health of TQG to the Plaintiff.

16. Shortly after the August 4, 2024 meeting, Wilson sent to the Plaintiff a number of abridged, partial and/or unidentified documents purporting to be responsive to the Plaintiff's and other investors' multiple requests for TQG's basic corporate information. All of that information was inconsistent and useless for the purpose of determining whether TQG was a viable business and had a positive valuation.

17. On or around August 31, 2025, the Plaintiff demanded that the Defendant return the Plaintiff's $25,000 investment, but Biafore has not responded.

18. The Plaintiff filed the original Complaint on November 22, 2025. Biafore through his prior attorney approached the Plaintiff on December 19, 2025 (after unsuccessfully trying to speak with the Plaintiff himself on the phone and by text on or around December 5 and 6, 2025) with a settlement offer that the Plaintiff accepted, but Biafore shortly thereafter refused to sign the settlement agreement ready for execution.

## CLAIM FOR RELIEF
## VIOLATIONS OF SECTION 10(b) OF THE EXCHNAGE ACT

19. The Plaintiff realleges and incorporates by reference paragraphs 1 through 18.

20. The Defendants, in connection with the purchase and sale of securities, employed devices, schemes, and artifices to defraud, made untrue statements of material fact, and omitted material facts necessary to make the statements not misleading.

21. The Defendants acted with scienter in engaging in the fraudulent conduct described herein.

22. As a direct and proximate result of Defendants' continuous pattern of fraud, conspiracy to defraud, intentionally incomplete and misleading disclosures and perjury (product viability of the lockers, ability to have them installed at scale, presence of a team able to conduct installations, investor financing sufficient for installations at scale, -- all of those representations by the Defendants were fraudulent from the beginning), on which the Plaintiff reasonably relied, the Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, reasonable attorneys' fees, costs, and expenses.

## COMMON LAW FRAUD

23. The Plaintiff repeats and incorporates by reference paragraphs 1 through 18.

24. At all relevant times, the Defendants continuously provided false and misleading information and documentation to the Plaintiff. Those false and misleading reports were provided to cover

up the fact that the Defendants fraudulently induced investment by the Plaintiff into TQG, through which investment the Defendants benefited.

25. The Plaintiff reasonably relied on the fraudulent representations described herein and as a direct and proximate result of the Defendants' unlawful conduct, the Plaintiff has suffered and continues to suffer irreparable harm for which the Plaintiff is entitled to an award of damages to the fullest extent permitted at law, reasonable attorneys' fees, costs, and expenses.

## UNPAID WAGES

26. As part of the investment in TQG, the Plaintiff executed the Employment Agreement, which promised specific wages in exchange for being available as the advisory board member. The Plaintiff was an at-will employee, spent many hours consulting Biafore on business issues. The Plaintiff was never paid the promised wages in the amount of $29,250 (prorated in a daily basis from the date of executing the investment documents to the date of filing this action). As Biafore fully controlled TQG and was the sole operator of the company, he is responsible for the breach of the Employment Agreement and non-payment of the wages due the Plaintiff.

**WHEREFORE,** the Plaintiff respectfully requests judgment against the Defendant, and a declaration that the Defendant committed fraud; compensatory damages in the amount of the $25,000 invested by the Plaintiff plus $29,250 in unpaid wages; interest and costs of suit; any attorneys' fees; and such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

Dated: June 12, 2026

Alex Mostovoi, Plaintiff Pro Se

BANK OF AMERICA

## Adv Plus Banking - 3740 : Account Activity

### Transaction details

| | |
|---|---|
| Posting date | Jun 13, 2025 |
| Description | Check |
| Type | Check |
| Status | Cleared |
| Check # | 296 |
| Amount | -$25,000.00 |
| Description | Check |
| Merchant name | Check |
| Transaction category | Cash, Checks & Misc: Checks |

Exhibit A

Docusign Envelope ID: 2663719F-B1C5-4DAD-84FE-0B6DD3CF5F48

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is entered into as of 24-05-25 (the "Effective Date") by and between **TQG, Inc.**, a Delaware corporation (the "Company"), and Alex Mostovoi ("Employee").

NOW, THEREFORE, for good and valuable consideration (the receipt and adequacy of which are hereby acknowledged), the parties covenant and agree as follows:

---

## 1. Title; Duties

**1.1** Starting on the Effective Date, the Company shall employ Employee as an Advisory Board Member ("Advisory Member").

**1.2** Employee shall report to the Company's Board of Directors (the "Board") and shall perform such duties consistent with that title as may be assigned by the Board.

**1.3** Employee shall serve remotely but acknowledges that duties may require participation in Zoom conferences.

## 2. Time and Effort

Employee agrees to:

- Devote such time as necessary to fulfill duties assigned by the Board; and
- Attend at least six (6) Advisory Board meetings per year.

  With the Board's written approval (not to be unreasonably withheld), Employee may serve on non-competitive outside boards, subject to the Company's Global Code of Conduct and Corporate Governance Principles.

## 3. Term

The Term of this Agreement shall commence on the Effective Date and continue until terminated pursuant to Section 6.

## 4. Compensation; Benefits

**(a) Base Salary.**

– Annual salary of not less than US $59,000, subject to applicable taxes and deductions, payable in accordance with the Company's payroll schedule.

– The Board may increase this amount at its discretion; any increase shall become the new Base Salary.

**(b) Stock Options and Restricted Stock Units.**
– Employee shall be eligible for equity awards (stock options and/or RSUs) under the Company's equity plans, upon terms determined by the Board.

**(c) Effective Date Grants.**
– On the Effective Date, the Company will grant RSUs covering 250,000 shares of Common Stock, subject to vesting as described below.

**(d) Two-Year RSUs.**
– The RSUs granted under Section 4(c) shall vest in equal installments on each of the first and second anniversaries of the Effective Date, subject to Employee's Continuous Service.

**(e) Benefits Plans.**
– Employee acknowledges that **no benefits**, other than those **required by Delaware law**, are initially provided under this Agreement.
– Any additional benefit plans (health, retirement, etc.) must be approved in writing by the Board.

**(f) Vacation.**
– Employee may select working hours and vacation schedule as needed; no fixed vacation days apply.

**(g) Expenses.**
– The Company shall reimburse Board-approved and customary business expenses (travel, meals, etc.) upon presentation of documentation, no later than December 31 following incurrence.
– The Company will reimburse professional fees incurred in negotiating this Agreement up to US $20,000, upon submission of invoices.

**(h) Withholding.**
– All amounts paid under this Agreement are subject to applicable tax withholdings.

**5. Other Plans**

Nothing in this Agreement shall limit Employee's rights under any retirement, stock purchase, pension, insurance, profit-sharing or similar plans of the Company now or hereafter in effect.

**6. At-Will Employment; Termination**

**(a) At-Will Employment.**
– Employee's service is at-will and may be terminated by either party at any time, with or without cause or notice.

**(b) Termination for Cause.**
– If the Company terminates Employee for Cause (Section 7(a)), Employee shall receive only accrued Base Salary and vested benefits through the termination date.

**(c) Resignation; Notice.**
– Employee may resign at any time by providing at least four (4) weeks' prior written notice; Employee will be paid accrued Base Salary and vested benefits through the last day of employment.

**(d) No Severance or Additional Benefits.**
– Employee acknowledges that **no severance benefits**, continuation of benefits, or other separation payments are provided by this Agreement, except as required by law or separately approved in writing by the Board.

**(e) Disability.**
– If Employee becomes disabled (as defined in Section 7(b)), the Company may terminate employment; Employee will receive accrued Base Salary and vested benefits through the date of termination.

**(f) Death.**
– Upon Employee's death, the Company shall pay his estate accrued Base Salary and vested benefits through the date of death; no severance is payable.

**(g) Board Resignation.**
– Upon termination of Employee's service for any reason (other than death), Employee shall resign from the Advisory Board effective the same date.

**7. Definitions**

**(a) "Cause"** means any one of the following events, uncured (if curable) within thirty (30) days of written notice:
(i) Material breach of the Confidentiality Agreement;
(ii) Conviction of, or plea of nolo contendere to, a felony or misuse of Company property;
(iii) Willful failure to perform duties;
(iv) Intentional tort harming the Company;
(v) Flagrant dishonesty or disloyalty; or
(vi) Immoderate use of alcohol or drugs that impairs performance (as determined by an independent physician).

**(b) "Disability"** means inability to perform duties for four (4) consecutive months or 120 days in any 12-month period due to physical or mental impairment.

**(c) "Continuous Service"** means uninterrupted service to the Company, excluding authorized leaves of absence of up to 30 days and any periods prior to commencement under this Agreement.

**8. Section 280G**

If any payment to Employee on account of a Change in Control would constitute a "parachute payment" under Section 280G of the Code, the Company will determine (through its independent accountants) whether to pay in full or reduce the payment to maximize Employee's after-tax receipt.

**9. Compliance with Section 409A**

To the extent any amounts payable hereunder constitute deferred compensation under Section 409A of the Code, such amounts shall be paid only upon Employee's Separation from Service (as defined in the Treasury regulations) and, if Employee is a "specified employee," no earlier than six months after such Separation.

**10. Choice of Law; Venue**

This Agreement shall be governed by California law (without regard to conflict-of-laws rules). Venue for any proceeding shall be Marin County, California.

**11. Arbitration**

All disputes under this Agreement shall be resolved by final, binding arbitration before JAMS, except for Excluded Claims as defined by applicable law. The arbitration shall take place near Employee's last work location, and the Company will pay all arbitration fees in excess of what Employee would pay in court.

**12. Indemnification; D&O Coverage**

Employee shall be entitled to participate in the Company's standard form of indemnification agreement for executive officers and to any directors & officers insurance coverage provided thereby.

**13. Clawback and Recovery**

All compensation under this Agreement is subject to the Company's clawback policies.

**14. Notices**

All notices hereunder must be in writing and delivered by personal delivery, overnight courier, or fax (with confirmation) to the parties' respective addresses; effective upon actual receipt.

**15. Entire Agreement; Amendment**

This Agreement (including Exhibit A) constitutes the entire agreement between the parties and supersedes all prior agreements. It may be amended only by a written instrument signed by Employee and approved by the Board.

**16. Waiver; Consent**

Any waiver or consent must be in writing and signed by the party waiving its rights (and, for Company waivers, approved by the Board).

**17. Severability**

If any provision is held invalid or unenforceable, the remainder shall continue in full force and effect.

**18. Survival**

Provisions that by their terms survive termination (e.g., confidentiality, indemnification, Section 409A compliance) shall remain in effect.

**19. Successors**

This Agreement binds and inures to the benefit of the parties and their permitted successors and assigns. Employee's duties are personal and may not be delegated without the Company's written consent.

**20. Assignment**

Neither party may assign this Agreement, except the Company may assign in connection with a merger, consolidation, or sale of substantially all assets.

**21. Certain Conditions, Representations, Covenants**

**21.1** Employment is contingent on satisfactory proof of Employee's right to work in the U.S.
**21.2** Employee agrees to sign and comply with the Confidentiality Agreement (Exhibit A).
**21.3** Employee represents no existing agreement prevents full performance hereunder.
**21.4** Without prior written approval, Employee shall not (i) disclose former employers' proprietary information; (ii) solicit former employers' customers or employees; or (iii) publicize employment.
**21.5** Employee acknowledges the right to seek independent legal counsel.

**22. Drafting**

The parties have both participated in drafting; no ambiguity shall be construed against either party.

**23. Counterparts**

This Agreement may be executed in counterparts (including by facsimile), each of which shall be deemed an original.

Docusign Envelope ID: 2663719F-B1C5-4DAD-84FE-0B6DD3CF5F48

SIGNATURE PAGE

Signed by:

**TQG, INC.**

By: /s/

717780EE061A4DB...

Neil Biafore

Chief Executive Officer

Duly Authorized by Board

Signed by:

23-05-25

**EMPLOYEE**

By: /s/

Alex Mostovoy

A005EA2240094EC...

24-05-25

**Exhibit A**

**Confidentiality Agreement**

[Intentionally Omitted]

Exhibit C

| Category | Metric |
|---|---|
| Lockers | Total Lockers |
| | New Lockers |
| | COGS |
| Recurring Revenue | ARR per Locker |
| | GAAP Revenue |
| Operating Expenses | Labor Costs |
| | Miscellaneous |
| | Total Non-Labor Costs |
| | Total Operating Costs |
| Sales Commissions | Per Locker |
| ARR Churn | Annual Churn Rate |

**Pricing Tier Notes:**

- 100–1,000 lockers: $4,630 (30% reduction)
- 1,000–5,000 lockers: $3,630 (22% reduction)
- >5,000 lockers: $3,267 (10% reduction)

**B. Income Statement**

| Metric | Year 1 |
|---|---|
| GAAP Revenue | $5,743,000 |
| COGS | $4,020,000 |
| Gross Profit | $1,723,000 |
| Labor Costs | $688,673 |
| Total Operating Costs | $695,633 |
| Net Operating Income | $1,027,367 |
| EBITDA | $1,027,367 |
| Net Income | $1,027,367 |

**C. Operating Ratios**

| Ratio | Year 1 |
|---|---|
| Gross Margin | 30% |
| Labor % of Revenue | 12.00% |
| Non-Labor % of Revenue | 0.12% |
| Total OPEX % of Revenue | 12.10% |
| EBITDA % of Revenue | 17.90% |

**D. ARR Rollforward with 5% Churn**

| Metric | Year 1 |
|---|---|
| Opening Balance | $0 |
| New ARR (Customers) | $5,743,000 |
| Churn (5% of Opening) | $0 |
| Closing Balance | $5,743,000 |

| Year 1 | Year 2 | Year 3 |
|---|---|---|
| 1,000 | 14,000 | 58,000 |
| 1,000 | 9,000 | 28,000 |
| $4,020,000 | $47,190,000 | $189,486,000 |
| $5,743 | $5,743 | $5,743 |
| $5,743,000 | $80,402,000 | $333,094,000 |
| $688,673 | $9,927,547 | $38,806,978 |
| $6,960 | $14,553 | $15,439 |
| $6,960 | $14,553 | $15,439 |
| $695,633 | $9,942,100 | $38,822,417 |
| $250 | $250 | $250 |
| 0% | 5% | 5% |

| Year 2 | Year 3 |
|---|---|
| $80,402,000 | $333,094,000 |
| $47,190,000 | $189,486,000 |
| $33,212,000 | $143,608,000 |
| $9,927,547 | $38,806,978 |
| $9,942,100 | $38,822,417 |
| $23,269,900 | $104,785,583 |
| $23,269,900 | $104,785,583 |
| $23,269,900 | $104,785,583 |

| Year 2 | Year 3 |
|---|---|
| 41.30% | 43.10% |
| 12.30% | 11.70% |
| 0.02% | 0.01% |
| 12.40% | 11.70% |
| 28.90% | 31.50% |

| Year 2 | Year 3 |
|---|---|
| $5,743,000 | $55,008,607 |
| $51,687,000 | $160,804,000 |
| $1,421,393 | $8,234,840 |
| $55,008,607 | $207,577,767 |

Exhibit D



QwikLocker

# Solving Last Mile

## Series A Round

QwikLocker Company Proprietary & Confidential

# Introducing QwikLocker

The Safest and Most Convenient Way to Ship and Receive Parcels

With locations conveniently located across the country and our proprietary security system, QwikLocker solves multiple last mile parcel delivery challenges encountered daily.

**Recipient Benefit**

**Secure locker Technology**

One-time codes issued for delivery service and recipient to retrieve parcels from locker

**Host Benefit**

**Traffic Driver**

48% of locker users ultimately made a purchase at host location

**Instant Arrival Alerts**

Recipients notified by email + text when parcel arrives at designated location

**Economical Advantage**

Recipients pick locker location and pay nominal delivery charge when parcels are ordered

**Carrier Agnostic**

Works with all major parcel delivery services including FedEx, UPS, DHL and USPS

# Our Leadership Team



Neil Biafore
Chairman & CEO



Bob Wilson
Board/President



Dan Albuquerque
CFO



Mark
Boyland
Board/ Legal



Chris Elder
CRO

# The Problem

- In urban areas with high demand for packages, U.S. package delivery faces challenges at the last mile.
- Travelers at hotels, hospitals, and Airbnb's experience delays and address issues, preventing timely delivery.
- Security needs to be enhanced in-light of rising theft concerns.
- The impact of the environment prompts the exploration of eco-friendly alternatives.

**14%** Of people have had a package stolen in the last 12 months

### Theft

With the YOY increase in package theft, home delivery presents a major challenge to security and reliability.

### Travel

Hotel guests, Airbnb guests, hospital patients, etc., typically lack a fixed address, making package delivery difficult.

### Timing

When traveling, poor timing can lead to missed deliveries, adding to the challenges of receiving packages on the go.

# The Solution

**We are creating the biggest parcel locker network in North America**

**We are the first parcel locker network that works with *all* U.S. mail couriers (FedEx, UPS, DHL, USPS)**

**Our fully automated package kiosk allows customers to receive orders from all couriers.**

- **Receive packages when traveling**
- **Utilize a secure package delivery site**
- **Access convenient pick-up locations and times**

**Lockers Powered By Our Proprietary Software**

**Our software is patent pending Application Number: *63521597***

## Why QwikLocker?

The first parcel locker designed for *ALL* retail deliveries

100% self-service (no touch for host organizations)

**Fast Fact:**




**Of retail customer respondents ultimately purchased an item from the host location**

# QwikLocker Solution for Clients



Have you used delivery lockers to send and receive parcels?




Graphic by The Times and The Sunday Times. Source: InPost




## 2024 U.S. Package Theft Statistics

- 21 billion packages shipped
- 14% of households experienced a package theft
- 57% of stolen packages were valued at over $100
- 60 million documented "porch pirate" events
- Total value of stolen packages = $8B
- 2024 projections = 25B packages will be shipped

THE QWIK GROUP | QwikLocker

# QwikLocker Solves Customer Concerns

## Why QwikLocker?

**Effortless and Convenient Package Pick-up**
24/7, 365-day access for consumers, ensuring they never miss a delivery and packages get stolen

**Innovation at its Core**
Prioritizing innovation with our patent-pending locker system and proprietary software

**Universal Compatibility**
Works with <u>all</u> couriers – FedEx, UPS, DHL, & USPS Deliveries & Returns

**Focus on Trust**
Dedicated to ethical conduct and building trust with consumers and businesses



# How it works

- Customers can pickup orders 24-7, 365 days a year
- QwikLockers allow for deliveries from all United States
- Couriers such as: FedEx, UPS, DHL, and USPS
- Zero cost to the host location




1. Global Delivery Solution
2. Instant Delivery Notifications
3. Secure Retrieval of package

QwikLocker Company Proprietary & Confidential

# First Mover Advantage



## Amazon Lockers

- 2015: The first Amazon lockers are installed
- 2023: 250,000+ Global Lockers

Note: Proprietary to Amazon Lockers ONLY



## InPost (Europe)

- 2016: The first open-source lockers are installed
- 2023: 40,000+ InPost lockers

**Global**

$2B+ Revenue
Poland, UK, Italy



## United States

No locker solution exists for package delivery outside the home

$20 Billion U.S. Market *Untapped*

# Unique Differentiation with QwikLocker

## Shopping Cart Integrations

We are letting retailers join the network for free with a simple plugin download:

opencart
shopify
volusion
3dcart
VTEX
Magento
WOO COMMERCE
BIGCOMMERCE
PrestaShop



## QwikLocker compared to Europe's Leader and Proprietary Brands

**In Europe, the InPost network of secure publicly located parcel delivery lockers has grown to over 40,000 locations in just 8 years**

amazon.com




**Amazon Lockers**

- Launched in 2015
- Global Network
- 2023 - 50,000+ locations

InPost




**InPost Lockers**

- Launched in 2016
- Select European Countries
- 2023 - 40,000+ locations

QwikLocker




- Started in 2024
- Open distribution network
- All parcel delivery carriers

THE QWIK GROUP | QwikLocker

## North America & Europe Segment Opportunity

| By Deployment Type | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | CAGR % (2024-2031) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Indoor Lockers | 288.77 | 315.14 | 345.01 | 378.53 | 416.07 | 458.06 | 505.12 | 557.80 | 616.81 | 682.98 | 757.12 | 840.20 | 10.56% |
| Outdoor Lockers | 139.93 | 152.43 | 166.58 | 182.44 | 200.18 | 219.99 | 242.16 | 266.94 | 294.66 | 325.69 | 360.41 | 399.25 | 10.37% |
| **Total** | **428.70** | **467.57** | **511.59** | **560.98** | **616.24** | **678.05** | **747.27** | **824.75** | **911.47** | **1008.67** | **1117.52** | **1239.45** | **10.50%** |

| By End User | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | CAGR % (2024-2031) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Retailers | 170.79 | 186.66 | 204.64 | 224.85 | 247.50 | 272.87 | 301.32 | 333.22 | 368.98 | 409.13 | 454.18 | 504.71 | 10.72% |
| Residential Buildings | 126.51 | 137.87 | 150.73 | 165.15 | 181.27 | 199.29 | 219.46 | 242.02 | 267.26 | 295.52 | 327.15 | 362.56 | 10.41% |
| Educational Institutions | 35.92 | 39.06 | 42.61 | 46.57 | 51.00 | 55.95 | 61.47 | 67.63 | 74.51 | 82.20 | 90.79 | 100.38 | 10.16% |
| Logistics and Shipping Companies | 95.47 | 103.98 | 113.61 | 124.41 | 136.47 | 149.95 | 165.03 | 181.88 | 200.72 | 221.82 | 245.41 | 271.80 | 10.34% |
| **Total** | **428.70** | **467.57** | **511.59** | **560.98** | **616.24** | **678.05** | **747.27** | **824.75** | **911.47** | **1008.67** | **1117.52** | **1239.45** | **10.50%** |

QwikLocker Company Proprietary & Confidential

THE QWIK GROUP | QwikLocker

# Major US Brand Customer

**Partnership of 7,600 Circle K Locations**

- **$60M in future revenue**
  - **Installing Now**

### Circle K Marketing Support

- **PR will be discussing our partnership with Circle K**
- **PR will be discussing our national partnership with NDA REQUIRED for deployment**

### Circle K Marketing

- **Push notifications to all Circle K mobile-app users geolocated within the markets deployed**

## Pipeline

| Customer Name | Stage | Pilot | Full Deployment |
|---|---|---|---|
| Circle K | Confirmed | | |
| Rite Aid | LOI | | |
| Kroger | LOI | | |
| Hardees | LOI | | |
| Jack in the Box | LOI | | |
| SoFi Stadium | 4 | | |
| Family Dollar | 4 | | |
| GPM | 1 | | |
| Schnuck's | 1/Referral | | |
| TA/Travel Centers of America | 1/Referral | | |
| TXB Stores | 1/Referral | | |
| TRIO Stores | 1 | | |

# The Ask & Why Invest

- $10M - $30M Series A
- Experienced start up team
- Positioned to capture 90%+ of USA market share
- $20B Total Addressable Market
- $1.5M Angel Invested
- Pre-money valuation $60M
- National Brand Customer agreement and pipeline
- Pending Aquisition from Public Traded Company



QwikLocker Company Proprietary & Confidential

QwikLocker

Exhibit C

**Article [B]: Rights and Preferences of Class A and Class B Common Stock**

**Section 1: Designation and Number of Shares**

1.1 The Company is authorized to issue 100 million shares of Class A Common Stock and 100 million shares of Class B Common Stock, par value $0.001 per share.

**Section 2: Dividend Rights**

2.1 **Board-Determined Dividends:** Holders of Common Stock shall be entitled to receive dividends as and when declared by the Board of Directors, out of funds legally available for the payment of dividends. The rate, timing, and amount of such dividends shall be determined by the Board of Directors at its sole discretion.

**Section 3: Liquidation Preference**

3.1 **First Right to Asset Liquidation for Preferred Stock:** In the event of any liquidation, dissolution, or winding up of the Company, whether voluntary or involuntary, the holders of Preferred Stock shall be entitled to receive, prior and in preference to any distribution of any assets of the Company to the holders of Common Stock, an amount per share equal to the par value of their shares plus any declared but unpaid dividends.

3.2 **Participation of Common Stock:** After the payment of the Liquidation Preference to the holders of Preferred Stock, the remaining assets of the Company shall be distributed among the holders of Class A and Class B Common Stock, pro rata, based on the number of shares held by each holder.

**Section 4: Conversion Rights**

4.1 **Optional Conversion:** Each share of Class B Common Stock shall be convertible, at the option of the holder thereof, at any time, into shares of Class A Common Stock. The conversion ratio shall initially be one share of Class B Common Stock for one share of Class A Common Stock, subject to adjustments as set forth in Section 4.2.

4.2 **Adjustments:** The conversion ratio shall be adjusted in the event of any stock split, stock dividend, combination, or other recapitalization affecting the Class A or Class B Common Stock.

**Section 5: Voting Rights**

5.1 **Class A Common Stock:** No voting rights shall be attached to Class A Common Stock.

5.2 **Class B Common Stock:** Each share of Class B Common Stock issued shall carry 10 voting rights.

**Section 6: Protective Provisions**

6.1 **Consent Required:** The Company shall not, without the written consent of the holders of at least a majority of the outstanding shares of Class B Common Stock, either directly or by amendment, merger,

consolidation, or otherwise: (a) Alter or change the rights, preferences, or privileges of the Class B Common Stock. (b) Create any new class or series of shares having rights, preferences, or privileges senior to or on parity with the Class B Common Stock. (c) Increase or decrease the authorized number of shares of Class B Common Stock. (d) Declare or pay any dividend on the Class A Common Stock (other than a dividend payable solely in shares of Class A Common Stock) or make any other distribution with respect to the Class A Common Stock.

**Section 7: Dilution and Anti-Dilution Provisions**

7.1 **Dilution for Class A Common Stock:** Holders of Class A Common Stock acknowledge that their shares are subject to dilution through the issuance of additional shares of Class A Common Stock, Class B Common Stock, Preferred Stock, or other equity securities by the Company.

7.2 **Anti-Dilution for Class B Common Stock:** In the event the Company issues additional shares of Class B Common Stock or other securities convertible into or exercisable for Class B Common Stock at a price per share less than the conversion price in effect immediately prior to such issuance, the conversion ratio for Class B Common Stock shall be adjusted to ensure that holders of Class B Common Stock are not diluted. The adjustment shall be made by multiplying the conversion ratio by a fraction, the numerator of which is the number of shares of Class B Common Stock outstanding immediately prior to such issuance plus the number of shares of Class B Common Stock that the aggregate consideration received by the Company for such issuance would purchase at the conversion price, and the denominator of which is the number of shares of Class B Common Stock outstanding immediately prior to such issuance plus the number of shares of Class B Common Stock so issued.

**Section 8: Miscellaneous**

8.1 **Notices:** Any notice required by the provisions of this Article to be given to the holders of Class B Common Stock shall be deemed given if deposited in the United States mail, postage prepaid, and addressed to each holder of record at his address appearing on the books of the Company.

8.2 **Amendment:** This Article may be amended, altered, or repealed only with the approval of the Board of Directors.

**Section 9: Preemptive Rights**

9.1 **Preemptive Rights:** Holders of Class A and Class B Common Stock shall not have any preemptive rights to subscribe for or purchase any additional shares of stock or any other securities of the Company.

**Section 10: Right of First Refusal**

10.1 **Right of First Refusal:** The Company shall have the right of first refusal, to be exercised by the Board of Directors, in the event that any holder of Class B Common Stock proposes to sell, transfer, or otherwise dispose of such shares.

**Section 11: Transfer Restrictions**

11.1 **Transfer Restrictions:** Transfers of Class A and Class B Common Stock shall be subject to restrictions as set forth in any agreement between the Company and the holders of Class A or Class B Common Stock, as well as applicable securities laws.

**Section 12: Reacquired Shares**

12.1 **Reacquired Shares:** Any shares of Class A or Class B Common Stock that are reacquired by the Company shall resume the status of authorized but unissued shares of Common Stock and may be reissued as part of a new series of Common Stock to be created by resolution or resolutions of the Board of Directors.

**Section 13: Severability**

13.1 **Severability:** If any provision of this Article is found to be invalid or unenforceable, the remaining provisions of this Article shall remain in full force and effect.

---

This updated version includes the dilution provision for Class A Common Stock and anti-dilution provision for Class B Common Stock.